**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**SANDRA WILLIS**                                                                **PLAINTIFF**

**V.**                                                    **CIVIL ACTION NO. 2:13-CV-60-KS-MTP**

**ALLSTATE INSURANCE COMPANY**                                           **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

For the reasons stated above, the Court **grants in part and denies in part** Defendant's Motion for Summary Judgment [119] and **denies** Plaintiff's Motion for Summary Judgment [123].

<u>**I. BACKGROUND**</u>

This is an insurance coverage dispute. Plaintiff's house was destroyed by a fire on June 14, 2012. At the time of the fire, the house was insured under an insurance policy issued by Defendant. Plaintiff filed a claim for benefits. Defendant then conducted an investigation of the loss that lasted approximately eight months. On February 27, 2013, Defendant denied Plaintiff's claim for the contents of the house, contending that she had misrepresented material facts related to the claim. On March 10, 2013, Defendant issued a check to Plaintiff for $75,100.00, the policy limit of coverage for the dwelling.

On March 5, 2013, Plaintiff filed a lawsuit [1-2] against Defendant in the Circuit Court of Forrest County, Mississippi. Defendant removed the case to this Court on March 27, 2013 [1]. Plaintiff filed her Amended Complaint [14] on August 8, 2013. Therein, she asserted claims of breach of contract, bad faith, negligence/gross negligence, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. After discovery, the parties filed cross-motions for summary judgment [119, 123], which the Court now addresses.

<u>**II. STANDARD OF REVIEW**</u>

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

### III. DISCUSSION

#### A.    *Breach of Contract – Contents*

A plaintiff asserting a breach of contract must prove 1) the existence of a valid and binding contract, and 2) that the defendant has breached it. *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (Miss. 2012). Plaintiff contends that Defendant breached the policy by denying her contents claim. Defendant argues that it denied Plaintiff's contents claim because she made material misrepresentations during the claim process, and the policy [119-1] provides: "We do not cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstances."

*1.     Waiver*

Plaintiff argues that Defendant waived application of the provision cited above by failing to plead it as an affirmative defense. Material misrepresentation is an affirmative defense that Defendant would be required to prove at trial. *See, e.g. FDIC v. Denson*, 908 F. Supp. 2d 792, 798 (S.D. Miss. 2012); *Mattox v. W. Fid. Ins. Co.*, 694 F. Supp. 210, 217 (N.D. Miss. 1988).[1] Of course, "[f]ailure to timely plead an affirmative defense may result in waiver and the exclusion of the defense from the case." *LSREF2 Baron, LLC v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014) (citation and punctuation omitted). "However, a technical failure to comply precisely with Rule 8(c) is not fatal. A defendant does not waive a defense if it was raised at a pragmatically sufficient time and did not prejudice the plaintiff in its ability to respond." *Id.* "It is left up to the discretion of the trial court to determine whether the party against whom the unpleaded affirmative defense has been raised has suffered prejudice or unfair surprise." *Levy Gardens Partners 2007, LP v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013). The Fifth Circuit has "found no waiver where no evidence of prejudice exists and sufficient time to respond to the defense remains before trial." *Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009).

Defendant denied [119-37] Plaintiff's claim on the basis of material misrepresentation on February 27, 2013 – weeks before this case was filed. Plaintiff has been aware of the defense throughout the case. She conducted discovery on the issue, thoroughly briefed it, and does not claim to have been prejudiced. The Court concludes, therefore, that Defendant did not waive the affirmative defense of material misrepresentation. *See Pasco*, 566 F.3d at 578 (where defendant

---

[1]*But see McCord v. Gulf Guar. Life Ins. Co.*, 698 So. 2d 89, 92 (Miss. 1997) (contrasting violation of a concealment policy clause with raising fraud as a defense).

raised defense 52 months after complaint was filed, but there remained time for plaintiff to respond and conduct discovery, there was no prejudice or waiver); *Cook v. Admiral Ins. Co.*, 438 F. App'x 313, 319-20 (5th Cir. 2011) (where plaintiff was able to adequately brief and respond to argument that policy exclusion applied, he was not prejudiced by defendant's failure to plead it).

　　　2.　　*Miss. Code Ann. § 83-13-13*

　　　Plaintiff argues that Defendant can not rely upon any defense arising from her proof of loss because it failed to comply with Mississippi Code Section 83-13-13. The statute provides:

> In case of destruction or damage of property by fire where the same is insured against fire, it shall be the duty of the insurance company or companies liable for such loss, within a reasonable time after receiving notice thereof, to furnish to the insured proper blanks upon which to make the required proof of loss, with full directions as to what proof is required to secure the payment of the policy. If the insurance company fails to comply with this section, the failure of the insured to make proper proof of loss prior to the suit shall be no defense to the suit upon the policy, and in all cases the insured shall have a reasonable time in which to make such proof after the blanks and directions are received.

MISS. CODE ANN. § 83-13-13. Therefore, a policy's requirement of "proof of loss is waived where the insurer fails to furnish to the insured" a proper form as required by the statute. *United States Fid. & Guar. Co. v. Whitfield*, 355 So. 2d 307, 310 (Miss. 1978); *see also United States Fid. & Guar. Co. v. Arrington*, 255 So. 2d 652, 656 (Miss. 1971) ("The insurance companies may not raise the defense of no proof of loss when proper forms are not furnished . . . .").

　　　Defendant has not invoked the policy's proof of loss provision, and it did not deny Plaintiff's contents claim because she failed to provide proof of loss. Rather, it denied the claim because she allegedly made material misrepresentations of fact. The statute is irrelevant to that issue.

　　　3.　　*Knowing and Willful*

　　　"In Mississippi, for an insurance company to defeat a policy on the basis of a concealment

clause, it must establish that statements by the insured were (1) false *and* (2) material *and* (3) knowingly and willfully made." *Clark v. Aetna Cas. & Sur. Co.*, 778 F.2d 242, 245 (5th Cir. 1985); *see also McCord*, 698 So. 2d at 92. Innocent "oversights" or "misstatements" will not trigger such an exclusion. *Watkins v. Cont'l Ins. Cos.*, 690 F.2d 449, 453 (5th Cir. 1982); *see also Claxton v. Fid. & Guar. Fire Corp.*, 175 So. 210, 212 (5th Cir. 1937) (overstatements of loss based on an "erroneous estimate of value which is but the expression of opinion" will not void a policy). The Court need only address the third element – that a material misrepresentation was "knowingly" and "willfully" made.

It is undisputed that Plaintiff provided false information on her contents list; she included items that were not in the house, and she provided incorrect ages for items. Also, Plaintiff admitted during her EUO [124-8] and deposition [173] that she had been investigated for and charged with insurance fraud related to the subject loss and claim. Likewise, Darryl Jordan, an inspector for the Hattiesburg Fire Department, told Defendant's investigator [125-33] that there were "little to no contents inside the home."[2] Kevin Butler, an investigator from the State Fire Marshall's office, told Defendant's investigator [125-33] that he was unable to "locate any evidence of the items" she included on her contents list, and that he intended to arrest Plaintiff for insurance fraud.

However, in her deposition [173], Plaintiff testified that her children had taken some of the contents out of the house without her knowledge. At Plaintiff's EUO [124-8], she testified that her children frequently moved contents in and out of the house without her knowledge, and she

---

[2]Where the Court refers to the investigations reports prepared by the Barnett Group, it is referring to Plaintiff's Exhibit 71 [125-33] to her Motion for Summary Judgment, rather than Defendant's Exhibits P and R [119-16, 119-18] to its Motion for Summary Judgment. The Court granted [160] Plaintiff's Motion to Strike [136] Defendant's Exhibits P and R [119-16, 119-18], but Plaintiff did not object to the consideration of her own exhibits.

corrected the ages she had previously provided for some of the contents. When directly asked whether there was anything on her contents list that she knew was not in the house at the time of the fire, she answered, "I don't know." She later corrected testimony from the EUO with an errata sheet [124-9], claiming that she had recently learned that her children took contents from the house before the fire.

Therefore, a genuine dispute of material fact exists as to whether Plaintiff's misrepresentations were "knowing and willful" or honest mistakes. The Court denies the parties' motions for summary judgment with respect to a breach of contract claim arising from the denial of Plaintiff's contents claim. *Cf. State Farm Fire & Cas. Co. v. Ramsey*, 719 F. Supp. 1337, 1343 (S.D. Miss. 1989) (where insured voluntarily amended his contents form prior to a decision by the company regarding payment under the policy and at his own insistence, a genuine fact dispute existed re: willfulness of material misrepresentations); *Edmiston v. Schellenger*, 343 So. 2d 465 (Miss. 1977) (refusal to correct initially innocent mistakes constitutes knowing and willful misrepresentation).

## B.   *Breach of Contract – ALE*

Defendant argues that it fully complied with its obligations under the additional living expenses ("ALE") provision of the policy, and that Plaintiff's claim for breach of the ALE provision should be dismissed. A plaintiff asserting a breach of contract must prove 1) the existence of a valid and binding contract, and 2) that the defendant has breached it. *Banks*, 90 So. 3d at 1224-25. The policy [119-1] provides: "We will pay the reasonable increase in living expenses necessary to maintain your normal standard of living when a direct physical loss we cover . . . makes your residence premises uninhabitable." To receive ALE benefits, the insured must "produce receipts for

any increased costs to maintain [her] standard of living while [she] reside[s] elsewhere . . . ."

The record contains very little evidence related to ALE. When Defendant's adjuster, Jim Price, met with Plaintiff on June 15, 2012, he filled out a "Field A.L.E. Worksheet" [119-5] with her. He took down information regarding Plaintiff's typical living expenses and explained the ALE allowances [119-3, 124-12].[3] He never followed up with her about ALE, and the record contains no evidence that Plaintiff ever requested ALE or presented any receipts for payment.

Plaintiff apparently contends that Defendant breached the ALE provision by failing to follow up with her to see if she needed ALE, but she did not identify a policy provision that requires Defendant to seek out Plaintiff and ask if she has an ALE claim. Regardless, Plaintiff failed to produce any receipts or identify any other evidence of increased costs to maintain her standard of living after the fire. Absent such evidence, Defendant has no obligation to pay anything under the ALE provision. *See Russ v. Safeco Ins. Co. of Am.*, No. 2:11-CV-195-KS-MTP, 2013 U.S. Dist. LEXIS 42333, at *25 (S.D. Miss. Mar. 26, 2013) (where plaintiff failed to present specific factual evidence demonstrating that he incurred additional living expenses, there was no genuine issue for trial). The Court grants Defendant's motion for summary judgment as to Plaintiff's claim for breach of the policy's ALE provision.

## C. *Breach of Contract – Theft*

Plaintiff argues that Defendant breached the policy by failing to investigate or make a coverage determination on her theft claim, while Defendant argues that it closed Plaintiff's theft

---

[3]Where the Court refers to Defendant's claim history, it is referring to Plaintiff's Exhibits 17 and 18 [124-12, 124-13] to her Motion for Summary Judgment, rather than Defendant's Exhibit B [119-2] to its Motion for Summary Judgment. The Court granted [160] Plaintiff's Motion to Strike [136] Defendant's Exhibit B [119-2], but Plaintiff did not object to the consideration of her own exhibits.

claim because she failed to provide the necessary information.

The policy [119-1] requires an insured to "promptly" give Defendant's agent notice of a loss, and to "[r]eport any theft to the police as soon as possible." It also requires the insured to provide a signed and sworn proof of loss within sixty days of the theft. An insured must provide all "accounting records, bills, invoices" and other documents which it "may reasonably request to examine . . . ;" to "show . . . the damaged property;" and to "produce . . . others to the extent it is within the insured person's power to do so . . . ." Finally, the policy generally provides that Defendant will not "cover any loss or occurrence in which any insured person has concealed . . . any material fact or circumstance."

### 1.    *Relevant Facts*

On July 16, 2012, Plaintiff reported to Defendant's adjuster, Arletta Henderson, that she had a theft loss [125-20]. Henderson explained to Plaintiff that she had to file a separate claim from her fire loss. On August 1, 2012, Plaintiff again mentioned the theft loss to Henderson, who again explained that Plaintiff had to file a separate claim. Plaintiff stated that she had not filed a theft claim because she hoped that the police would make an arrest and recover her property.

Plaintiff filed a theft claim on August 9, 2012 [125-22]. An adjuster, Yvette Lewis, spoke with Plaintiff, who stated that approximately eleven to twenty items were stolen from the storage building and trailer in her back yard, including four-wheelers, mini refrigerators, stoves, a hot water heater, air conditioners, table saws, and lawnmowers. She estimated the stolen property's value to be $16,780.00.

Lewis attempted to contact Plaintiff on August 13, 2012, and left a message for her at work and by voice mail. On August 20, 2012, Lewis sent Plaintiff a letter providing contact information

and instructing Plaintiff to contact her if she wished to pursue the theft claim. On August 30, 2012, Lewis called Plaintiff, but Plaintiff was unable to talk. Lewis told Plaintiff that she would need to give a recorded statement, and Plaintiff requested that Lewis call her back on September 4, 2012. On September 7, 2012, Lewis tried to call Plaintiff but was unable to reach her. Lewis left a message on voice mail and sent Plaintiff a letter informing her that Defendant needed more information to process her claim.

On October 10, 2012, Lewis again tried to call Plaintiff, but was unable to reach her. Lewis left a message and sent Plaintiff a letter. Lewis wrote that Defendant needed more information to process the theft claim, and that it would be closed if she did not hear from Plaintiff within ten days. On October 25, 2012, Lewis sent Plaintiff a letter stating that the theft claim would be closed because Plaintiff had failed to respond to calls or correspondence. Lewis told Plaintiff to contact her if she changed her mind and wanted to pursue the claim.

On November 5, 2012, Defendant's counsel took Plaintiff's EUO [124-8]. Plaintiff informed Defendant's counsel that she had filed a theft claim, and Defendant's counsel requested a copy of the police report. On November 13, 2012, Plaintiff's counsel provided Defendant's counsel [28] with a copy of the Hattiesburg Police Department's Investigative Report [119-15]. Defendant has not reopened Plaintiff's theft claim, requested further information from her, or otherwise addressed the claim. It remains closed and unresolved.

2.     *Law and Analysis*

Mississippi law provides that an insurer has a duty to conduct an adequate and prompt investigation of an insurance claim. *Murphree v. Fed. Ins. Co.*, 707 So. 2d 523, 531 (Miss. 1997); *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 623 (Miss. 1988). An insurer has a

9

continuing duty to investigate and evaluate a claim; the duty extends even after the insured retains counsel or files suit. *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 629 (5th Cir. 2008); *Russ*, 2013 U.S. Dist. LEXIS 42333 at *43-*44; *Lebon v. State Farm Fire & Cas. Co.*, No. 1:08-CV-509-LTS-RHW, 2010 U.S. Dist. LEXIS 25915, at *4 (S.D. Miss. Mar. 18, 2010). Likewise, the insured "has a duty to cooperate and assist in the investigation and resolution of a claim." *Washington v. Am. Heritage Life Ins. Co.*, 500 F. Supp. 2d 610, 617 (N.D. Miss. 2007). The insured must "respond to all reasonable inquiries and . . . give all reasonable assistance;" "failure to do so may well deny them recovery." *Monticello Ins. Co. v. Mooney*, 733 So. 2d 802, 807 (Miss. 1999).

Summary judgment would be inappropriate because there are genuine disputes of material fact regarding Plaintiff's theft claim. First, there is a factual dispute concerning Plaintiff's cooperation with Defendant's investigation of the claim. Defendant's adjuster attempted to contact Plaintiff from August 13, 2012, through October 25, 2012, but Plaintiff failed to respond and provide Defendant with the information necessary to process her claim. However, Plaintiff provided Defendant with cursory information in early August 2012, and her counsel later provided a copy of the police report. A jury can decide whether Plaintiff fulfilled her "duty to cooperate and assist in the investigation and resolution of a claim." *Washington*, 500 F. Supp. 2d at 617.[4]

Next, there is a factual dispute concerning the promptness and adequacy of Defendant's investigation of Plaintiff's theft claim. Plaintiff provided Defendant with notice of the loss as early

---

[4]It is not clear from the record whether Defendant provided Plaintiff with "proper blanks upon which to make the required proof of loss, with full directions as to what proof is required to secure the payment of the policy" for the theft claim. MISS. CODE ANN. § 83-13-13. Therefore, to the extent Defendant relies upon Plaintiff's failure to provide proof of loss for the theft claim, a factual dispute exists concerning the applicability of MISS. CODE ANN. § 83-13-13 and/or Plaintiff's compliance with the policy's requirement of a signed, sworn proof of loss.

as July 16, 2012 – the day after she discovered the theft and the same day she reported it to police. But Defendant did nothing until August 9, 2012, requiring Plaintiff to call separately and open a new claim. From August 13, 2012, through October 25, 2012, Defendant tried to investigate the claim, but Plaintiff failed to respond to the adjuster's inquiries. Plaintiff's counsel eventually provided Defendant with a copy of the police report, but Defendant did not reopen the claim or otherwise address it.[5] A jury can decide whether Defendant fulfilled its duty to conduct an adequate and prompt investigation of the theft claim.

A delay in payment "is not attributable to an insurer where the insured or his counsel refuses to cooperate or provide the necessary information." *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 75 (5th Cir. 2014). However, if the insurer fails to inform the insured or his counsel that it needs the information, the insurer "is responsible for the resulting delay in investigating [the] claim." *Id.* As there exists a genuine factual dispute concerning who was responsible for the failure to process Plaintiff's theft claim, the Court denies the parties' motions for summary judgment as to breach of contract arising from the theft claim.

### D.   *Bad Faith Denial – Contents*

Both parties seek summary judgment as to Plaintiff's bad faith claim arising from Defendant's denial of her contents claim. Defendant argues that it had an arguable basis for denial of the contents claim, and that Plaintiff has no evidence that it committed any acts or omissions that would rise to the level of intentional tort. Plaintiff contends that Defendant had no arguable basis for denial of the contents claim, and committed a variety of actions which rise to the level of intentional

---

[5]*See Gregory v. Cont'l Ins. Co.*, 575 So. 2d 534, 541 (Miss. 1990) ("An insurance carrier's duty to promptly pay a legitimate claim does not end because a lawsuit has been filed against it for nonpayment."); *Broussard*, 523 F.3d at 629 (insurer has a continuing duty to evaluate a claim which extends even after the insured files suit).

11

torts.

"[T]he insured has the burden of establishing a claim for bad faith denial of an insurance claim," and she "must show that the insurer denied the claim (1) without an arguable or legitimate basis, either in fact or law, *and* (2) with malice or gross negligence in disregard of the insured's rights." *United States Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 492 (5th Cir. 1992) (emphasis added); *see also Broussard*, 523 F.3d at 628; *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008); *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 233 (Miss. 2001). Both elements are "questions of law to be decided by the trial judge." *Jenkins*, 794 So. 2d at 233.

Here, the Court need only address the first element – whether Defendant had an arguable or legitimate basis for denial. An insurer has no arguable basis for delaying or denying payment on a claim if "nothing legal or factual would have arguably justified" its position. *Essinger*, 529 F.3d at 272. Phrased differently, an arguable reason is "one in support of which there is some credible evidence." *Tipton v. Nationwide Mut. Fire Ins. Co.*, 381 F. Supp. 2d 572, 579 (S.D. Miss. 2004). "There may well be evidence to the contrary." *Hood v. Sears Roebuck & Co.*, 532 F. Supp. 2d 795, 803 (S.D. Miss. 2005). Even if an exclusion or defense does not ultimately bar coverage, it can still constitute an arguable basis. *Sobley v. S. Natural Gas Co.*, 302 F.3d 325, 341 (5th Cir. 2002). Therefore, a "plaintiff bears a heavy burden in demonstrating to the trial court that there was no reasonably arguable basis for denying the claim." *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006).

Defendant denied Plaintiff's contents claim because it believes that she knowingly and willfully made material misrepresentations of fact regarding the contents of her home. The record contains a variety of evidence supporting this reason for denial:

- On June 14, 2012 – the day of the fire – Plaintiff told an Allstate representative that four people lived in the house: herself, her son, her daughter, and her grandson [125-20]. Plaintiff later provided the same information to Defendant's adjuster, James Price, and in a recorded statement taken by Defendant's adjuster, Arletta Henderson [119-14]. However, Plaintiff's daughter, Davidra Knight, testified during her EUO [140-6] that she was not living in the house at the time of the fire. This discrepancy is relevant insofar as Plaintiff initially claimed that certain contents were destroyed in the fire, but she later said that she did not know her daughter had taken them when she moved out.

- On June 19, 2014, Defendant's adjuster received information [125-20] indicating that a brick structure behind Plaintiff's home which had not been damaged by the fire was "packed with contents," including items similar to those claimed by Plaintiff.[6]

- On June 20, 2014, Defendant's adjuster received information [125-20] indicating that the house only contained one bed at the time of the fire, despite Plaintiff's inclusion of three full bedroom suites on her contents list.

- On June 21, 2012, law enforcement officers executed [125-19] a search warrant to photograph the contents of the brick structure and trailer behind Plaintiff's house. The warrant was based on an affidavit [125-18] from Daryl Jordan, a Hattiesburg Fire Inspector and Plaintiff's neighbor. Among other things, officers sought "evidence pertaining to . . . items of furniture that [Plaintiff] is claiming was destroyed in the fire," in relation to an "ongoing investigation" of violations of Miss. Code Ann. § 97-7-10 (prohibiting false representations for the purpose of defrauding a government agency).

- On July 12, 2012, Defendant received an investigative report [125-33] from The Barnett Group. Some of Plaintiff's neighbors told the Barnett investigator that they had "observed truckloads of furniture and contents being moved out of the insured residence "approximately one to two weeks prior to the fire."

- Daryl Jordan told the Barnett investigator [125-33] that "there were little to no contents inside the home." He stated "there were no remains of any couches, clothing or any other type of household items that would normally be in a home that is occupied."

- Kevin Butler, an investigator with the State Fire Marshall's Office, told the Barnett

---

[6] To be clear, the Court does not rely on Defendant's Exhibit Q [119-17], the Cause and Origin Report and Debris Sift prepared by M.A. Stringer & Associates, Inc. Rather, the Court relies on Plaintiff's Exhibit 17 to her Itemization of Undisputed Facts [125-20]. The Court assumes that Plaintiff has no objection to her own exhibit.

investigator [125-33] that "he [did] not believe that [Plaintiff] had anywhere near the items inside the insured residence that she is claiming. He stated that he has walked over the residence on several occasions and that he cannot locate any evidence of the items she [was] claiming. He noted that he could only find evidence of one mattress in the home and frames for two beds." He stated there was "an ongoing investigation" and that he intended to arrest Plaintiff for insurance fraud.

- On August 22, 2012, Plaintiff was arrested and charged with insurance fraud for claiming items that were not in her house at the time of the fire [125-21].

- During her EUO on November 5, 2012, Plaintiff admitted [125-13] that she had provided incorrect ages and values for some of the items on her contents list.

- During her EUO [119-33] on January 4, 2013, Plaintiff's daughter testified that she had removed her television and computer desk from the house, but Plaintiff [119-8] claimed that a television and computer desk from her daughter's room were destroyed in the fire.

- During his EUO [119-34] on January 4, 2013, Plaintiff's son testified that he had removed his television and game console from the house, but Plaintiff [119-8] claimed that a television and game console from her son's room were destroyed in the fire.

- On February 25, 2013, Plaintiff executed an errata sheet [125-14] to her EUO in which she claimed to have "recently learned" that certain contents were not in the house at the time of the fire because her children had removed them.

As the Court noted above, an arguable reason is "one in support of which there is some credible evidence," *Tipton*, 381 F. Supp. 2d at 579, and an insurer has no arguable reason for its claim decision if "nothing legal or factual would have arguably justified" its position. *Essinger*, 529 F.3d at 272. The evidence above – most of which is contained in Plaintiff's own exhibits – demonstrates that Defendant had an arguable reason to deny Plaintiff's contents claim for material misrepresentations. *See Broussard*, 523 F.3d at 628 (insurer had arguable basis for denial of Katrina claim based on adjuster's observation of debris line and condition of trees surrounding property); *Tipton*, 381 F. Supp. 2d at 579 (where insured's tenant provided statement that insured had misrepresented contents in the home, insurer had arguable reason to deny claim); *Am. Mfrs. Mut.*

14

*Ins. Co. v. Cupstid*, 673 F. Supp. 186, 190 (S. D. Miss. 1987) (where insurer received evidence tending to show misrepresentations by insured in connection with proof of loss, it had an arguable reason for denial of claim); *Russ*, 2013 U.S. Dist. LEXIS 42333 at *45-*47 (where credible evidence existed to support insurer's concealment-misrepresentation defense, summary judgment on bad faith was appropriate).

The existence of a genuine factual dispute as to whether Plaintiff's misrepresentations were knowing and willful is relevant insofar as "[t]he existence of a viable dispute means that both sides had arguable reasons to litigate the issue." *Hood*, 532 F. Supp. 2d at 803; *see also Cupstid*, 673 F. Supp. at 191 (where good faith dispute exists as to underlying contract claim, there is no plausible bad faith claim). "The fact that an insurer's decision to deny benefits may ultimately turn out to be incorrect does not in and of itself warrant an award of punitive damages if the decision was reached in good faith. Where an insurance carrier denies . . . payment of a valid claim, punitive damages will not lie if the carrier has a reasonable cause for such denial . . . ." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2003) (citations omitted).

For all of these reasons, the Court grants Defendant's motion for summary judgment as to Plaintiff's bad faith claim arising from the denial of her contents claim, and it denies Plaintiff's motion for summary judgment as to the same.

**E.    *Bad Faith Delay – Dwelling***

Plaintiff claims that Defendant exhibited bad faith by delaying payment on her dwelling claim for eight months after the loss with no arguable or legitimate reason. Defendant contends that the delay was necessary to conduct an adequate investigation.

A bad faith claim may arise from an insurer's delay of payment on a claim. *See James v.*

15

*State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 69 (5th Cir. 2014). To establish a bad faith delay claim, a plaintiff must prove that 1) the insurer was contractually obligated to pay the claim, 2) it "lacked an arguable or legitimate basis for its delay in paying" the claim, and 3) the delay "resulted from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort." *Id.* at 70. Of course, "Mississippi places a duty on insurers to properly investigate the claims asserted by their insured." *Id.* at 71. Therefore, "conducting a prompt and adequate investigation provides a legitimate basis for a payment delay," *Id.*, and "an insurer's conduct does not amount to gross negligence or an intentional tort as long as the insurer is actively investigating a claim." *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 400 (Miss. Ct. App. 2001) (citing *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1097 (Miss. 1996)); *see also McLendon v. Wal-Mart Stores, Inc.*, 521 F. Supp. 2d 51, 566 (S.D. Miss. 2007); *Washington*, 500 F. Supp. 2d at 617. Even if "hindsight reveals the investigation to have been fruitless," that is not enough to prove that it "proceeded in bad faith." *McLendon*, 521 F. Supp. 2d at 567.

The Court looks at the "totality of the circumstances to determine whether [Defendant] had an arguable or legitimate basis for its delay." *James*, 743 F.3d at 72. "[T]o better assess the claims," the Court should "analyze the investigation in discrete time periods . . . ." *Id.* Defendant's investigation is most readily separated into two overlapping phases: the initial investigation, and the EUO's/coverage opinion.

     *1.    Initial Investigation*

Plaintiff's house burned down in early morning on June 14, 2012, while no one was at home [125-20].[7] Defendant hired a cause and origin investigator. On June 18, 2012, the investigator

---

[7] Unless otherwise noted, the facts recited in this section were derived from Plaintiff's Exhibits

16

informed Defendant's adjuster that the Hattiesburg Fire Department contacted the state Fire Marshal because they believed the fire was suspicious, and that the Fire Marshal found clothes in the debris which smelled like gasoline. It was rumored among neighbors that Plaintiff did not live in the house at the time of the fire.

The claim was referred to Defendant's Special Investigations Unit ("SIU"). The SIU adjuster notified Plaintiff of what she should do to cooperate with the investigation [119-13]. On June 25, 2012, the adjuster took Plaintiff's recorded statement. She then formed an investigative plan which included the following steps: 1) speak with the cause and origin investigator about his findings, 2) speak with local authorities about their investigation, 3) speak with Plaintiff's neighbors about her whereabouts and residence, 4) verify Plaintiff's financial information, 5) obtain Plaintiff's utility and cell phone records, 6) possibly conduct examinations under oath, and 7) obtain recorded statements from Plaintiff's children. On June 29, 2012, Defendant hired an outside investigator, The Barnett Group, to assist in completing the investigation.

In the meantime, the cause and origin investigator reported other findings to the adjuster. First, he said that a structure behind Plaintiff's home was "packed with contents," some of which were similar to items claimed by Plaintiff. He also said that the debris indicated there had been little furniture in the home, and that the Fire Marshal's hydrocarbon detector had alerted in two rooms of the house. On June 27, 2012, the investigator provided a preliminary report that the fire's origin was "undetermined." In addition to the information previously provided, he said that there was only one bed in the home – despite Plaintiff's claim that four people lived there and had claimed multiple beds in her contents inventory..

17 and 18 [125-20, 125-21].

On July 9, 2012, Defendant received Plaintiff's credit history, and on July 12, 2012, an adjuster asked Plaintiff for a signed copy of her contents inventory. On July 16, 2012, an adjuster asked Plaintiff to provide cell phone and utility records to confirm information provided in her recorded statement, and to provide a signed copy of her contents list. On July 17, 2012, the adjuster obtained information regarding Plaintiff's claims after Hurricane Katrina.

The Barnett Group provided Defendant with an initial report [125-33] around July 12, 2012. Some of Plaintiff's neighbors reported that they had seen people removing contents from the house in recent weeks, and that they had not observed any lights on for months. The Hattiesburg Fire Department reported that there had been two other fires at the subject property. In June 2010, Plaintiff had an automobile fire, and in September 2009, the Fire Department received a call about smoke coming from the house. Fire Inspector Daryl Jordan – a neighbor of Plaintiff's – believed that the home had been vacant for months. He said that the debris did not reflect the normal amount of contents for an occupied home, and that there were a structure and trailer behind the house full of personal property. A Fire Marshall investigator, Kevin Butler, reported that he intended to arrest Plaintiff for insurance fraud. Samples from the debris had alerted a hydrocarbon detector, but Butler stated that the house was full of termites and was built from old pine, both of which could mislead the instrument. Finally, the Barnett investigator obtained water records, which indicated that Plaintiff had cut off the water in the house on July 2, 2012 – a couple of weeks before the fire.

Around July 26, 2012, the adjuster received a supplemental report [125-33] from the Barnett Group dated July 24, 2012. The report provided a variety of information. Neighbors reported that they believed Plaintiff had been living in the house at the time of the fire, and the Hattiesburg Police Department reported that Plaintiff was under investigation by a variety of state and federal law

enforcement agencies.

On July 30, 2012, Defendant received the cause and origin report. The cause and origin investigator believed that the fire originated in the attic, but that the source of ignition was undetermined. The report reiterated that there were many discrepancies between the debris sift and the contents Plaintiff claimed were destroyed in the fire. On the same day, Defendant received Plaintiff's utility records. According to the power company, there had only been enough power used at the loss location during recent months to run one refrigerator, at best. On August 1, 2012, Defendant received a variety of signed forms from Plaintiff, including her proof of loss [119-19], non-waiver agreement [119-7], and authorization to obtain records. Plaintiff also provided her water, sewer, and cell phone records.

On August 8, 2012, Defendant's SIU adjuster received a copy of the contents list that Plaintiff had provided to the contents adjuster, although Plaintiff had failed to sign each page of the list as requested. On August 10, 2012, the SIU adjuster advised the contents adjuster to begin reviewing the list for valuation. Over the next several days, Defendant prepared its estimate of the contents loss, and on August 16, 2012, the contents adjuster advised that the list appeared to be "well over the limits."

On August 26, 2012, Defendant's SIU adjuster was contacted by a fire department investigator who said that Plaintiff had been interrogated by the Fire Marshal and was going to be arrested and charged with insurance fraud. In the meantime, the contents adjuster completed her review of Plaintiff's contents list on August 30, 2012, and concluded that it was "well over the limits."

At this point, all that was left to conclude the investigation was to conduct the EUO's and

receive a coverage opinion. However, on December 27, 2012, Defendant received a supplemental report [125-33] from the Barnett investigator. The report included a copy of a Hattiesburg Fire Department incident report. According to the report, Plaintiff had a fire alarm at her post-fire residence on September 3, 2012, but when the Fire Department arrived, Plaintiff refused to let them enter the home and demanded that they leave the premises.

   2.   *The EUO's and Coverage Opinion*

   On July 19, 2012, Defendant determined that it would need to take an EUO, and on July 26, 2012, Defendant assigned the task to counsel, David Waldrop. On August 7, 2012, Waldrop informed Defendant's adjuster that he had scheduled the EUO's for August 22, 2012, which was the soonest that Plaintiff and her children were available. He sent a letter [119-21] to Plaintiff on August 10, 2012, confirming the date and advising her of obligations under the policy. Plaintiff responded via fax [119-22] on August 14, 2012, confirming her availability and advising that she would gather the required documents. Accordingly, Defendant suspended its investigation until August 29, 2012, to permit Waldrop to conduct the EUO's and prepare a coverage opinion.

   On August 21, 2012, Waldrop contacted Plaintiff to confirm that she and her children would appear for the EUO. Plaintiff stated that she had decided to retain counsel, and that they would not appear.

   On September 5, 2012, Waldrop sent a letter [119-23] to Plaintiff's counsel, Glenn White. Waldrop told White that EUO's of Plaintiff and her children had been scheduled for August 22, 2012, but that Plaintiff had cancelled because she decided to retain counsel. Waldrop requested that White contact him to reschedule the EUO's. On September 6, 2012, White responded [119-27], confirmed that he represented Plaintiff, and requested copies of the claim materials.

20

On October 4, 2012, Defendant instructed Waldrop to follow up with Plaintiff's counsel regarding the EUO's and to unilaterally set a date if no response was forthcoming. On October 11, 2012, Waldrop informed Defendant that Plaintiff had retained new counsel, and that the EUO's had been scheduled for November 5, 2012. Waldrop sent a letter [119-29] to Plaintiff's counsel confirming the date and requesting that Plaintiff bring certain documents.

On November 6, 2012, Waldrop called the adjuster to give a report. The EUO's had been scheduled to begin at 9:00 a.m. on November 5, 2012, but Plaintiff did not appear. Her counsel represented that she was at the hospital with her father, and they agreed to begin the EUO's later that day. Plaintiff appeared at 1:00 p.m. – but without her children. Plaintiff's counsel argued that her children were not insureds under the policy and, therefore, not required to submit to an EUO.[8] However, Plaintiff's counsel later agreed to contact Waldrop about conducting EUO's of Plaintiff's children. Waldrop conducted Plaintiff's EUO [125-13], and Plaintiff admitted that she had provided incorrect ages and values for some of the items on her contents list.

On November 10, 2012, Defendant received a letter from Waldrop providing a summary of the EUO. On November 13, 2012, Plaintiff's counsel sent a letter [148-3] to Waldrop, asking him when he was available to conduct the EUO's of Plaintiff's children, and suggesting that they would be available around Thanksgiving. On December 10, 2012, Waldrop sent a letter [119-32] to Plaintiff's counsel requesting to take the EUO's of Plaintiff's children on December 14, 2010.

---

[8] The policy [119-1] requires that the named insured "submit to examination under oath, separately and apart from any other person defined as you or insured person," and it requires the named insured to "produce representatives, employees, members of the insured's household or others to the extent it is within the insured person's power to do so . . . ." It further provides that an "insured person" is "the person named on the Policy Declarations as the insured," "that person's resident spouse," and "any relative" that is "a resident of [the named insured's] household." Plaintiff consistently maintained that her children – Davidra and David Knight –

A week later, Waldrop informed Defendant's adjuster that the EUO's of Plaintiff's children had been scheduled for January 4, 2013. The EUO's [119-33, 119-34] were conducted as scheduled, and Plaintiff's children testified that they had removed items from the house before the fire which Plaintiff claimed had been destroyed. On January 15, 2013, Defendant's adjuster received Waldrop's summary of the EUO's.

On January 24, 2013, Waldrop took sworn statements from several of Plaintiff's neighbors and provided a report to Defendant's adjuster. The next day, the adjuster contacted a Hattiesburg Fire Department investigator and asked about the status of their investigation. The investigator said that their results had been provided to the district attorney and Plaintiff's counsel. On February 5, 2013, the same Fire Department investigator reported that the case was going to be presented to a grand jury, and on February 19, 2013, she told the adjuster that the case had been no-billed.

On February 22, 2013, the adjuster reported the final outcome of Defendant's investigation. The cause of the fire was undetermined, but local authorities believed that there were few contents in the home at the time of the fire. A debris sift revealed that the contents in the home during the fire were not consistent with Plaintiff's list. Based on this information, a coverage opinion provided by Waldrop, and Plaintiff's arrest on charges of insurance fraud, the adjuster requested permission to deny the contents claim and pay the dwelling claim.

On February 27, 2013, Defendant's adjuster sent a letter [125-28] to Plaintiff and her counsel denying her contents claim because she had allegedly committed material misrepresentations concerning the contents of her home. On March 5, 2013, Defendant's adjuster asked Plaintiff's counsel where and how he would like the check issued for Plaintiff's dwelling benefits. On March

---

lived with her in the subject property.

10, 2013, Defendant issued a check [119-39] to Plaintiff and her counsel for the dwelling limits of $75,100.00.

    *3.    Analysis*

    Considering the facts outlined above – derived largely from Plaintiff's own exhibits – the Court concludes that at all relevant times prior to payment of Plaintiff's dwelling claim, Defendant was engaged in active investigation of the claim and did not delay payment in bad faith. "Mississippi places a duty on insurers to properly investigate the claims asserted by their insured," and "conducting a prompt and adequate investigation provides a legitimate basis for a payment delay," *James*, 743 F.3d at 71. Mississippi courts have held that "an insurer's conduct does not amount to gross negligence or an intentional tort as long as the insurer is actively investigating a claim." *Pilate*, 865 So. 2d at 400; *see also McLendon*, 521 F. Supp. 2d at 566; *Washington*, 500 F. Supp. 2d at 617.

    As demonstrated above, there was ample reason to investigate Plaintiff's dwelling loss from the very beginning of the claim process. Even if "hindsight reveals the investigation to have been fruitless," that is not enough to prove that it "proceeded in bad faith." *McLendon*, 521 F. Supp. 2d at 567. At worst, there were short gaps of inactivity later in the process, as Defendant attempted to schedule and conduct EUO's of Plaintiff and her children. But the policy [119-1] explicitly provided Defendant with the right to conduct the EUO's, and Mississippi courts have held that "[a]n insurance company has the right to request an oral examination under oath." *Archie v. State Farm Fire & Cas. Co.*, 813 F. Supp. 1208, 1213 (S.D. Miss. 1992) (citing *Saucier v. United States Fid. & Guar. Co.*, 765 F. Supp. 334, 336 (S.D. Miss. 1991); *Allison v. State Farm Fire & Cas. Co.*, 543 So. 2d 661, 663 (Miss. 1989)). Furthermore, Plaintiff contributed to the delay in obtaining the EUO's – and, as a result, the coverage opinion – by waiting until the last minute to retain counsel and then initially

refusing to produce her children for examination. *See Sansone v. Liberty Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS 25530, at *13 (S.D. Miss. Feb. 3, 2006) (A"plaintiff's failure to aid an investigation of a claim" may weigh "against a finding of bad faith.").

Plaintiff argues that Defendant was required to pay the dwelling claim within sixty days as required by the policy. The policy [119-1] provides: "We will settle any covered loss with you unless another payee is named in the policy. We will settle within 60 days after the amount of loss is finally determined." This clause, however, only requires payment of *covered* losses within sixty days, and before the Defendant settles a loss, it must determine whether it was covered. From the start of the investigation, Defendant received information raising the suspicion of arson. Both the Hattiesburg Fire Department and the State Fire Marshal initially believed that there was an accelerant present in the debris. Furthermore, the large amount of personal property stored in structures behind the house, the cause and origin investigator's opinion that the house did not contain the contents Plaintiff claimed, and Plaintiff's being arrested and charged with insurance fraud all provide ample reason to thoroughly investigate the cause of the fire.[9] "[A]n arson investigation constitutes an arguable reason to delay payment and there is no obligation to complete investigations within a contractual provision time limit if the insurer has a legitimate reason." *Jones v. Reynolds*, No. 2:06-CV-57, 2006 U.S. Dist. LEXIS 40120, at *17 (N.D. Miss. May 16, 2008).

For all the reasons provided above, the Court finds that Defendant had an arguable and legitimate reason to delay payment of Plaintiff's dwelling claim to complete its investigation of the

---

[9] Plaintiff argues that Defendant's investigation only related to her contents claim. The facts recited above – which were drawn from Plaintiff's exhibits – demonstrate the inaccuracy of that argument.

dwelling loss.[10] Therefore, the Court grants Defendant's motion for summary judgment as to Plaintiff's claim for bad faith delay of payment on her dwelling claim, but it denies Plaintiff's motion for summary judgment as to the same.

### F.      Bad Faith Delay – Theft

To establish a claim for bad faith delay of payment under an insurance policy, a plaintiff must prove that 1) the insurer was contractually obligated to pay the claim, 2) it "lacked an arguable or legitimate basis for its delay in paying" the claim, and 3) the delay "resulted from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort." *James*, 743 F.3d at 70.

As noted above, genuine disputes of material fact exist regarding 1) the promptness and adequacy of Defendant's investigation of the theft claim, and 2) Plaintiff's cooperation with Defendant's investigation. Therefore, a jury must decide whether Defendant was contractually obligated to pay the theft claim.

Furthermore, Defendant has not provided any explanation for why the theft claim was not reopened or otherwise addressed after Plaintiff's counsel provided Defendant [125-24] with a copy

---

[10] *See Casey v. Liberty Mut. Ins. Co.*, 308 F. App'x 743, 747 (5th Cir. 2009) (worker's comp insurer had legitimate reason to delay payment where it was trying to obtain a toxicology report that was potentially relevant to coverage); *Dauro v. Allstate Ins. Co.*, 114 F. App'x 130, 136 (5th Cir. 2004) (no bad faith where insurer delayed payment to complete investigation of claim, insurer ultimately paid the claim in full, and delay was due in part to plaintiff's failure to cooperate); *Tutor v. Ranger Ins. Co.*, 804 F.2d 1395, 1398-99 (5th Cir. 1986) (no bad faith where insurer delayed payment for over four months to conduct "reasonable inquiry" into validity of claim and "good faith dispute" over value of destroyed property); *Washington*, 500 F. Supp. 2d at 617 (insurer had legitimate reason to delay payment of life insurance where it was trying to obtain autopsy report); *Jones*, 2006 U.S. Dist. LEXIS 40120 at *20-*23 (no bad faith where insurer delayed payment of claim to obtain plaintiff's cell phone records, which plaintiff refused to provide); *Caldwell*, 686 So. 2d at 1098 (delay of payment did not constitute bad faith where insurer investigated existence of other insurance).

of the police report on November 13, 2012. The record provides no explanation why Defendant failed to reopen the theft claim, investigate it further, request additional information from Plaintiff's counsel, or otherwise address the theft claim after Plaintiff's counsel provided the police report. "An insurance carrier's duty to promptly pay a legitimate claim does not end because a lawsuit has been filed against it for nonpayment." *Gregory*, 575 So. 2d at 541. Defendant had a continuing duty to evaluate the theft claim, even after Plaintiff had retained counsel and filed suit. *Broussard*, 523 F.3d at 629. Therefore, the Court finds that Defendant failed to demonstrate that it has an arguable or legitimate reason for delaying payment of Plaintiff's theft claim after November 13, 2012. *See James*, 743 F.3d at 73 (where insurer provided no explanation for its failure to investigate claim for a three-month period, a fact issue existed as to whether it had an arguable or legitimate reason for delay).

As for the third factor, an insurer's delaying investigation and payment of a claim can constitute an intentional tort in disregard of the insurer's rights. *See AmFed Cos., LLC v. Jordan*, 34 So. 3d 1177, 1185 (Miss. Ct. App. 2009). But "an insurer's conduct does not amount to gross negligence or an intentional tort as long as the insurer is actively investigating a case." *Washington*, 500 F. Supp. 2d at 617. Defendant has done nothing with respect to the theft claim from November 13, 2012, to present. A genuine dispute of material fact exists as to whether its inaction is tantamount to an intentional tort.

For these reasons, the Court finds that there exists a genuine dispute of material fact as to Plaintiff's claim for bad faith delay of her theft claim. The Court denies the parties' motions for summary judgment on that issue.

## G.     *Bad Faith Delay – ALE*

26

To establish bad faith delay of payment on an insurance claim, "the insured must first demonstrate that the claim or obligation was in fact owed . . . ." *Essinger*, 529 F.3d at 271 (quoting Jackson, MISS. INS. LAW & PRACTICE, § 13:2); *see also James*, 743 F.3d at 70. The Court granted summary judgment in favor of Defendant as to Plaintiff's claim for breach of the policy's ALE provision, finding that Plaintiff had failed to present any evidence that she made an ALE claim or incurred any additional living expenses. Therefore, the Court likewise grants summary judgment as to Plaintiff's claim for bad faith delay of ALE benefits.

## H.    *Breach of Duty of Good Faith and Fair Dealing*

"All contracts carry an inherent covenant of good faith and fair dealing." *Ferrara v. Walters*, 919 So. 2d 876, 883 (Miss. 2005). "The covenant holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Id.* (punctuation omitted). It "imposes a duty not to prevent or hinder the other party's performance, but may also impose a duty to take some affirmative steps to cooperate in achieving these goals." *Id.* (punctuation omitted). Exercising a contractual right does not breach the implied covenant of good faith and fair dealing, *Lambert v. Baptist Mem'l Hosp.-N. Miss. Inc.*, 67 So. 3d 799, 804 (Miss. Ct. App. 2011), and "to have a breach of the duty of implied good faith and fair dealing there must first be an existing contract and then a breach of that contract." *Daniels v. Parker & Assocs., Inc.*, 99 So. 3d 797, 801 (Miss. Ct. App. 2012). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct with violates standards of decency, fairness or reasonableness." *Cenac v. Murray*, 609 So. 2d 1257, 1272 (Miss. 1992). Bad faith is "more than bad judgment or negligence; rather bad faith implies some conscious wrongdoing because of dishonest

27

purpose or moral obliquity." *Limbert v. Miss. Univ. of Women Alumnae Assoc., Inc.*, 998 So. 2d 993, 998 (Miss. 2008); *see also Johnson v. Palmer*, 963 So. 2d 586, 594 (Miss. Ct. App. 2007).

Here, there exist genuine disputes of material fact related to whether Defendant breached the policy in bad faith with respect to its delay in handling Plaintiff's theft claim. Therefore, the Court likewise finds that there exist genuine disputes of material fact related to whether Defendant breached the implied duty of good faith and fair dealing.

## I.    *Negligence/Gross Negligence*

"The relationship between the insurer and the insured arises by contract . . . ." *Owen v. Universal Underwriters Ins. Co.*, 252 F. Supp. 2d 324, 328 (S.D. Miss. 2003). Therefore, to the extent Plaintiff's negligence-based claim arises from Defendant's failure to fulfill its duties under the policy, it sounds in contract, rather than tort. *See O'Hara v. Travelers*, No. 2:11-CV-208-KS-MTP, 2012 U.S. Dist. LEXIS 104048, at *38 (S.D. Miss. July 26, 2012); *Law v. Aetna Life Ins. Co.*, No. 5:09-CV-116-DCB-JMR, 2011 U.S. Dist. LEXIS 75244, at *10 (S.D. Miss. July 12, 2011); *Wallace v. Allstate Ins. Co.*, No. 1:08-CV-1460-HSO-JMR, 2010 U.S. Dist. LEXIS 7235, at *6 (S.D. Miss. Jan. 14, 2010). Bad faith, however, is "an independent tort separable in both law and fact from the contract claim asserted by the insured under the terms of the policy." *James*, 743 F.3d at 65. Among other things, it requires proof of "gross negligence." *Id.* at 70.

Therefore, the Court grants in part and denies in part Defendant's motion for summary judgment as to Plaintiff's negligence and gross negligence claims. To the extent Plaintiff's simple negligence claim arises from Defendant's alleged failure to fulfill its contractual duties, the claim is subsumed by her breach of contract claims and addressed in the same manner as stated above. To the extent Plaintiff's gross negligence claim arises from Defendant's alleged bad faith, the claim is

subsumed by Plaintiff's bad faith claims and addressed in the same manner as stated above.

**J.     *Intentional Infliction of Emotional Distress***

A claim for intentional infliction of emotional distress requires evidence that the defendant's actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *White v. Walker*, 950 F.2d 972, 978 (5th Cir. 1991). The parties have not adequately briefed the question of how a claim for intentional infliction of emotional distress is addressed within the context of a bad faith case, but the District Courts of this state have treated it as running parallel to the bad faith claim. *See McClendon*, 521 F. Supp. 2d at 568 (where insurer had legitimate reason to deny coverage, IIED claim was without merit); *American States Ins. Co. v. The Estate of Neighbors*, 1996 U.S. Dist. LEXIS 21334, at *6 (N.D. Miss. Mar. 13, 1996) (where insurer had arguable reason to deny coverage, there was not sufficient evidence to support IIED claim). Here, there exist genuine disputes of material fact related to Plaintiff's claim for bad faith delay of her theft claim. Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiff's claim for intentional infliction of emotional distress.

**K.     *Punitive and Extra-Contractual Damages***

Mississippi law permits a plaintiff to recover punitive damages where an insurer delays a claim in bad faith. *James*, 743 F. 3d at 69. Furthermore, "[i]nsurers who are not liable for punitive damages may nonetheless be liable for consequential . . . damages (e.g., reasonable attorney fees, court costs, and other economic losses) where their [conduct] is without a reasonably arguable basis but does not otherwise rise to the level of an independent tort." *Broussard*, 523 F.3d at 628.

As noted above, there exist genuine disputes of material fact related to Plaintiff's claim for

bad faith delay of her theft claim. Accordingly, the Court denies the parties' motions for summary judgment as to Plaintiff's claims for punitive and extra-contractual damages.

## IV. CONCLUSION

For the reasons stated above, the Court **grants in part and denies in part** Defendant's Motion for Summary Judgment [119] and **denies** Plaintiff's Motion for Summary Judgment [123]. Specifically:

- The Court **denies** the parties' motions for summary judgment as to Plaintiff's claim for breach of contract related to Defendant's denial of her contents claim.

- The Court **grants** Defendant's motion for summary judgment as to Plaintiff's claim for breach of contract related to ALE benefits.

- The Court **denies** the parties' motions for summary judgment as to Plaintiff's claim for breach of contract related to the theft claim.

- The Court **grants** Defendant's motion for summary judgment as to Plaintiff's bad faith claim arising from the denial of her contents claim and **denies** Plaintiff's motion for summary judgment as to the same.

- The Court **grants** Defendant's motion for summary judgment as to Plaintiff's bad faith claim arising from the delay of payment on her dwelling claim and it **denies** Plaintiff's motion for summary judgment as to the same.

- The Court **denies** the parties' motions for summary judgment as to Plaintiff's bad faith claim arising from the delay of payment on her theft claim.

- The Court **grants** Defendant's motion for summary judgment as to Plaintiff's bad faith claim related to ALE benefits.

- The Court **denies** Defendant's motion for summary judgment as to Plaintiff's claim for breach of the implied duty of good faith and fair dealing.

- The Court **grants in part and denies in part** Defendant's motion for summary judgment as to Plaintiff's claims of negligence and gross negligence.

- The Court **denies** Defendant's motion for summary judgment as to Plaintiff's claim of intentional infliction of emotional distress.

- The Court **denies** the parties' motions for summary judgment as to Plaintiff's claims for punitive and extra-contractual damages.

SO ORDERED AND ADJUDGED this 31st day of October, 2014.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE

31